IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

RUBEN CARREON, individually and
d/b/a RC FOREST PRODUCTS, LLC,

Plaintiff,

v.                                                                      No. CIV 09-161 BB/CEG

GOODTIMES WOOD PRODUCTS, INC.,
a Texas Corporation; JOHN WILLIAMS,
individually and as President of Good
Times Wood Products, Inc.; JAMES W.
COOKE and LINDA COOKE, individually
and d/b/a JL ENTERPRISES; JIM
KELLAR; ED WEHRHEIM, individually
and in his official capacity as Chairman of
the Catron County Commission; The
CATRON COUNTY CITIZENS GROUP,
a New Mexico not-for-profit organization;
WILLIAM AYMAR, individually and in
his official capacity as Catron County
Manager, and RON SHORTES,
individually and in his official capacity as
Catron County Attorney,

Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court for consideration of motions for summary judgment

[Docs. 146, 164, 165] filed by Defendants Goodtimes Wood Products, Inc. ("GTWP") and John

Williams. These Defendants seek judgment in their favor on all counts of the complaint that are

directed at them, specifically Counts I, V, VIII, IX, and X, although not every Count is asserted

against both of these Defendants. One of the motions also requests summary judgment on GTWP's

counterclaim for breach of contract.  Having considered the submissions of the parties and the applicable law, the Court will grant the motions in part and deny them in part.

Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Medina v. Income Support Div.*,  413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).  In response, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S. 574, 587-88 (1986).  To avoid summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at a minimum, an inference of the existence of each essential element of the case. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). When viewing the evidence, the Court must draw reasonable inferences in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.  The Court will address these Defendants' motions with this standard in mind.[1]

---

[1]The Court must first comment on the manner in which these Defendants have litigated their motions.  Though they are filed separately, the motions are simply three sections of what would be a very long, somewhat repetitive motion for summary judgment.  This District's local rules contemplate that each party will be granted one opportunity to file a motion for summary judgment, not two or three.  Where the Court has determined that multiple motions seem to be an attempt to evade the page-and-exhibit limits found in Local Rules 7.5 and 10.5, this Court as well as other judges in this District have not hesitated to simply reject the multiple motions. *See, e.g., Rice v. City of Santa Fe*, 00-CV-01669, Doc. 199  (D. N.M. 8/21/02); *Cash v. Lockheed Martin Training Solutions, Inc.,* 09-CV-901, Doc. 81 (D. N.M. 9/03/10).  The Court has not done so in this case because given the presence of multiple Defendants, it was not clear there was any attempt to evade the requirements of the local rules.  However, the multiple motions did present these Defendants' arguments in a confusing manner.  For example, Count V of the complaint appears to be the subject of at least two of the motions, if not all three.  Also, it would have been much simpler to address the motions if the evidence attached to the motions, as well as the legal arguments contained in those motions, were all in one place rather than attached to three separate motions.  As Judge Johnson put it, filing multiple motions is counterproductive because such motions "create additional haystacks in which courts are obliged to look for the needle." *Rice, supra*.  Consideration of these multiple

**Discussion**

Defendant GTWP is the subject of several state-law causes of action stated in the complaint -- Count I, for tortious interference with a contractual relationship; Count V, for breach of contract; Count VIII, for breach of the covenant of good faith and fair dealing; Count IX, for punitive damages; and Count X, for prima facie tort. Defendant Williams is named in the same causes of action, except he is not a defendant with respect to Count VIII, the good-faith-and-fair-dealing claim. For ease of discussion, the Court will address the evidence and arguments made with respect to each Count and each Defendant, rather than proceeding motion by motion.

**Claim for Punitive Damages:** Plaintiff's Count X is a stand-alone claim for punitive damages. Under New Mexico law, such a claim is not a separate cause of action but merely a possible element of allowable damages. *See Sanchez v. Clayton*, 877 P.2d 567, 572-73 (N.M. 1994) (punitive damages cannot be awarded unless plaintiff establishes an underlying cause of action). Summary judgment is appropriate to the extent this request for damages is presented as a separate cause of action.

**Tortious Interference With Contract:** Plaintiff contends GTWP and Williams interfered in a contract Plaintiff entered into with Defendants James and Linda Cooke, d/b/a JL Enterprises.[2] Under the contract between Plaintiff and the Cookes, Plaintiff agreed to purchase pallets of bucked and split firewood from the Cookes. Plaintiff would then re-sell this bundled firewood to GTWP

---

motions has thus been delayed due to the confusion they engendered. The multiple motions also required Plaintiff's counsel to file three different response briefs rather than just one. In sum, the Court's time and energy was unnecessarily consumed, as was that of Plaintiff's counsel. The Court will consider this if costs become an issue and trusts counsel for these Defendants will not engage in this type of litigation practice in the future.

[2]For ease of reference, the Court will refer to these Defendants and their enterprise as the "Cookes." The Court has also referred to Plaintiff throughout this opinion, without differentiating between Plaintiff as an individual and Plaintiff doing business as RC Forest Products, LLC.

to fulfill purchase orders submitted to Plaintiff by GTWP.[3]   Plaintiff alleges that GTWP and Williams wrongfully induced the Cookes to terminate their contract with Plaintiff.

In New Mexico, it is not easy for a plaintiff to succeed on a tortious-interference-with-contract claim.  *See, e.g., Guest v. Berardinelli*, 195 P.3d 353, 363 (N.M. App. 2008).  The elements of such a claim are as follows:  (1) the defendant had knowledge of a contract between the plaintiff and a third party; (2) the contract was not fulfilled, or the plaintiff was unable to fulfill its contractual obligations; (3) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract; (4) the plaintiff suffered damages resulting from the breach; and (5) the defendant induced the breach without justification or privilege to do so.  *See Martin v. Franklin Capital Corp.*, 195 P.3d 24, 27 (N.M. App. 2008).  The "justification or privilege" element has been distilled into the following requirement:  the plaintiff must prove that the defendant acted with either an improper motive or by improper means.  *Id.*  With respect to that requirement, existing contracts that are not terminable at will are given greater protection than either prospective contracts or at-will contracts, which are treated in the same manner as prospective contracts.  *See Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003) (at-will contracts are equivalent to prospective contracts); *Zarr v. Washington Tru Solutions, LLC*, 208 P.3d 919, 922-23 (N.M. App. 2009) (New Mexico cases have consistently recognized that existing contractual relations merit more protection than prospective contracts; at-will employment relationship is treated as prospective employment relationship for purposes of claim of intentional interference with employment contract).

The main difference between existing contracts and at-will contracts is that to prove intentional interference with an at-will contract, the plaintiff must prove that the defendant's sole motive for its actions was to harm the plaintiff.  *Zarr*, 208 P.3d at 923.  If the defendant had a

---

[3]There is some indication in the evidence submitted that Plaintiff had other sources of split firewood that augmented the wood he purchased from the Cookes, although it is not clear whether this evidence was based on personal knowledge.  [Doc. 146, Exh. D, p. 134]

legitimate business reason for its actions, the plaintiff cannot prevail on the motive question, even if the defendant also intended to harm the plaintiff.  *Id.* at 924.

Whether the contract between Plaintiff and the Cookes qualifies as an existing contract or an at-will contract is therefore significant.  The undisputed evidence submitted in this case indicates the contract was indeed terminable at will.   The contract stated as follows:    "This CONTRACT/AGREEMENT may be terminated by either party at any time with thirty (30) days written notice."  [Complaint, Exh. C]  No other provision in the contract places any limits on either party's ability to terminate the contract.  Thus, the only restriction on the power to terminate the contract was the requirement of  thirty days' advance notice.  Such an advance-notice requirement does not alter a contract's status as an at-will contract.  *See Int'l Klafter Co., Inc. v. Continental Cas. Co.*, *Inc.*, 869 F.2d 96, (2d Cir. 1989) (contract terminable by either party with thirty days' notice was at-will contract); *Cave Hill Corp. v. Hiers*, 570 S.E.2d 790, 793 (Va. 2002) (same, for employment contract, despite ostensible term of employment of five years); *Alderman Drugs, Inc. v. Metropolitan Life Ins. Co.*, 515 N.E.2d 689, 694  (Ill. App. 1987) (contract was terminable at will where insured could terminate with thirty days' notice); *Shaull Equip. & Supply Co. v. Rand*, 2004 WL 3406088 (M.D. Pa. 2004) (contract could be terminated with or without cause, on sixty days' written notice; contract was terminable at will).  Since the contract was terminable at will, Plaintiff is required to prove that the sole motivation for the actions of GTWP and Williams was to harm Plaintiff.

With the above discussion in mind, the Court turns to the elements of the tort as they concern both Williams and GTWP.  The only element that has been clearly established is the second one, that the contract was not fulfilled; it is undisputed that the Cookes terminated their contract with Plaintiff by refusing a purchase order he had submitted to them.  [Complaint, Exh. D]  With respect to Defendant Williams, however, Plaintiff has introduced no evidence that would satisfy the first

element, that Williams knew of the contract between Plaintiff and the Cookes; or the third element, that Williams played an active and substantial part in causing the Cookes to terminate the contract.

Williams submitted an affidavit stating he did not know of the contract between Plaintiff and the Cookes until this lawsuit was filed.  [Doc. 146, Exh. B]  He further averred that he had never personally communicated with either of the Cookes, or with any other representative of JL Enterprises.  [*Id.*]  Both of the Cookes confirmed this in their depositions, with each stating they had never spoken to Williams.  [Doc. 146, Exh. C, p. 82; Exh. D, p. 136]  To contradict this evidence, Plaintiff has presented evidence indicating the Cookes had contact with two different representatives of GTWP.  Linda Cooke testified at her deposition that she had a telephone conversation with a "secretary" at GTWP's home office (this was most likely Barbara Ford, GTWP's office manager), and that she was sent a fax following that conversation.  [Doc. 155, Exh. K, pp. 130-31]  James Cooke testified that he had personally spoken to a representative of GTWP who "showed up looking for" Plaintiff, and who gave Mr. Cooke the impression GTWP was not happy with Plaintiff.  [Doc. 155, Exh. J, pp. 71-72]  This evidence is not sufficient to allow an inference to be drawn that Williams himself knew about the Cookes, and is certainly not sufficient to raise an issue of fact as to whether he knew about the Cookes' contract with Plaintiff.  The mere fact that Williams was in charge of GTWP's operations does not mean he can be charged with knowledge that other employees or officers of GTWP might possess.  Of course, if Williams never spoke to the Cookes and did not know about their contract with Plaintiff, he could not have played an active and substantial part in causing them to terminate that contract.  Thus, no issue of fact has been raised with respect to the first or third element of tortious interference with contract, and summary judgment in favor of Defendant Williams is appropriate on this claim.

The situation is more complicated with respect to GTWP.  As noted above, some evidence was presented indicating that certain representatives of GTWP were aware of the Cookes and had

communications with them, although this evidence is not sufficient to allow an inference that GTWP knew about the contract between the Cookes and Plaintiff.  In addition, Plaintiff presented the following evidence concerning GTWP and its possible relationship to the Cookes:  (1) when the Cookes terminated the contract with Plaintiff by refusing his last purchase order, James Cooke wrote on the face of the purchase order a statement to the effect that it was being refused because the Cookes had been told there was not a customer any longer, and because the Cookes had received another offer for "a much higher price per load"  [Complaint, Exh. D]; (2) a few days after GTWP terminated its contract with Plaintiff, GTWP entered into a similar contract with K & B Timberworks, agreeing to purchase bagged and boxed firewood for resale to GTWP's customers [Doc. 155, Exhs. E, M]; (3) following the termination of Plaintiff's contracts with the Cookes and GTWP, Plaintiff observed the Cookes bucking and splitting firewood, and wrapping it and stacking it just as Plaintiff had done for GTWP; he also observed them preparing boxed firewood, which he saw loaded onto a truck at the K & B Timberworks site; the truck was from the same company that had previously picked up pallets of wood prepared by Plaintiff for sale to GTWP [Doc. 155, Exh. N].

From the above evidence an inference can be drawn that while the contract between Plaintiff and the Cookes was still in effect, someone offered the Cookes more money than they were being paid by Plaintiff, to provide the same type of firewood.  An inference can also be drawn that K & B Timberworks was the entity that did so, since there is evidence the Cookes were preparing boxed wood that was then shipped from the K & B Timberworks site.  However, no inference can be drawn that GTWP had any direct negotiations with the Cookes or made the better offer referred to by the Cookes.  There was no contract between the Cookes and GTWP, although such a contract was formed between GTWP and K & B Timberworks; also, there is no evidence of any discussion between the Cookes and GTWP, concerning wood supplies; and finally, the trucking company used

by GTWP was picking up wood from K & B Timberworks, not directly from the Cookes.  Thus, there is no evidence that GTWP played an active and substantial part in causing the Cookes to terminate their contract with Plaintiff.  It is not sufficient that GTWP, by switching suppliers from Plaintiff to K & B Timberworks, may have indirectly caused the Cookes to also switch from Plaintiff to K & B Timberworks; there is no evidence that GTWP knew this would happen, or even knew that Plaintiff, as well as K & B Timberworks, used the Cookes as suppliers to help meet their orders from GTWP.  Such an indirect and uninformed role in a contract termination is not the type of "active and substantial" intentional activity that can support a claim for tortious interference with a contract.  *cf. Martin v. Franklin Capital Corp.*, 195 P.3d 24, 28 (N.M. App. 2008) (merely contracting with a party, even with knowledge of a prior inconsistent contract between that party and another,  is not the type of activity that will support a tortious-interference claim).

Even if there was some evidence indicating that GTWP did actively and substantially cause the Cookes to terminate their contract, Plaintiff's claim would fail.  This is because, as discussed above, the Cookes/Plaintiff contract was an at-will contract, and it was therefore incumbent on Plaintiff to show that the sole motive for GTWP's actions was to harm Plaintiff.  Switching suppliers, as GTWP did, is a business decision that provides a legitimate business reason for GTWP's actions.  This is especially true here, where there was ample evidence that GTWP was not satisfied, rightly or wrongly, with Plaintiff's performance.  [*See, e.g.,* Doc. 164, Exh. C, pp. 226-28; Doc. 167, Exh. 1, pp. 282]  Even if GTWP acted in part out of a desire to harm Plaintiff (a proposition not supported by any evidence), the fact that a legitimate business reason also existed negates any claim Plaintiff might have had for tortious interference with contract.  *See Zarr, supra*, 208 P.3d at 924-25 (no material fact dispute as to claim of intentional interference with an at-will contract, where legitimate business reason existed for action, even if there was also a motive to harm plaintiff).

It should also be noted there was no evidence either GTWP or Williams used improper means in whatever dealings they may have had with the Cookes.  An improper means may substitute for an improper motive for purposes of a tortious-interference claim.  However, the improper-means factor is quite limited in scope; actions that might qualify as improper means include bribery, violence, threats or intimidation, deceit or misrepresentation, unfounded litigation, defamation, or other unlawful conduct.  *See Zarr, supra*, 208 P.3d at 922.  None of the evidence submitted in this case rises to such a level; at most it establishes that GTWP switched suppliers and in the process may have breached its contract with Plaintiff, an issue that will be discussed below.  Such a breach of contract, if it occurred, does not constitute improper means, especially given New Mexico's reluctance to expand the tort of intentional interference.  *See, e.g., Guest v. Berardinelli*, *supra*, 195 P.3d at 363 (noting that establishing tortious interference with contract is not easy).

Based on the foregoing, summary judgment is appropriate on Plaintiff's claims of tortious interference with contract, with respect to both GTWP and Williams.

**Breach of Covenant of Good Faith and Fair Dealing:**  Plaintiff accuses GTWP of breaching the implied covenant of good faith and fair dealing that is inherent in every contract, and raises a separate cause of action regarding that allegation.  It should be noted, however, that the parties agreed Texas law would apply to the contract in question, and for that reason Texas law also applies to the claim for breach of the implied covenant that is contained within the contract.  *Scott v. Machinists Automotive Trades Dist. Lodge No. 190 of Northern California,* 827 F.2d 589, 592 (9th Cir. 1987) (claim of breach of implied covenant of good faith and fair dealing clearly depends upon interpretation of the contract); *cf. Aiken v. Employer Health Services, Inc.*, 1996 WL 134933 (10th Cir. 1996) (question of whether a contract of employment contains an implied covenant of good faith and fair dealing is a question of contract construction).  Under Texas law, in a commercial context breach of the implied covenant does not give rise to an independent cause of action, but is

a form of breach of contract.  *See Northern Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606 (Tex. 1998); *see also Southwest Materials Handling Co. v. Nissan Motor Co., Ltd.,* 2000 WL 1664160 (N.D. Tex., unpublished) ("Texas courts recognize an independent cause of action for the breach of the duty of good faith and fair dealing only where a "special relationship" exists between the parties..."). Summary judgment will be granted on this claim as a stand-alone cause of action, and Plaintiff's implied-covenant arguments will be considered in addressing the claim for breach of contract.

**Breach of Contract Claim Against Defendant Williams Individually:**  Plaintiff's claim for breach of contract names both GTWP and Williams as Defendants liable for the alleged breach. Williams maintains the contract in question was between GTWP and Plaintiff, that he is merely the CEO of GTWP and is therefore not a party to the contract, and that the claim against him individually must be dismissed.  In response, Plaintiff raised a new legal theory that was nowhere present in the case prior to the summary-judgment briefing – he argues Defendant Williams might be liable under an alter ego theory, which is one method of piercing the corporate veil.  Williams, of course, objects to consideration of this theory at all; he points out that it was not included in the complaint and there has been no other prior notice of the theory that would have allowed an opportunity to develop facts in opposition to it.

In New Mexico, a request to pierce the corporate veil and hold an individual shareholder liable for corporate acts must be included in the complaint.  *See, e.g., Dellaira v. Farmers Ins. Exch.*, 102 P.3d 111, 116 (N.M. App. 2004) (plaintiffs waived alter ego claim because failed to plead the theory in original or amended complaint); *Garcia v. Coffman*, 946 P.2d 216, 219 (N.M. App. 1997) (complaint was adequate to inform defendant that plaintiff sought to hold defendant personally liable for acts of corporation).  The Court agrees that Plaintiff's breach-of-contract claim does not include allegations that bring to mind the alter-ego theory.  Plaintiff alleged only that Defendant Williams

was president of GTWP and was directly responsible for performance of the contract with Plaintiff, and that Williams terminated the contract and has been unwilling to reinstate it.  [Complaint, Count V]  These allegations accuse Williams only of acting in his role as GTWP's president, which is not a sufficient basis to impose personal liability on him for the breach of contract.  *See Morrow v. Cooper*, 824 P.2d 1048, 1051 (N.M. App. 1991).

Plaintiff's failure to allege the theory in his complaint, however, is not the end of the matter, for two reasons.  First, in the Tenth Circuit, raising an issue for the first time in a summary-judgment-response brief can be construed as a request to amend the complaint to add that issue.  *See Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).  Second, in New Mexico and elsewhere, piercing the corporate veil is an equitable remedy.  *See Scott v. AZL Resources, Inc.*, 753 P.2d 897, 900 (N.M. 1988).  Given the Court's equitable powers, if Plaintiff had discovered evidence warranting such action, the failure to include the veil-piercing theory in his complaint would not be fatal.  For this reason, the Court has examined the evidence presented by Plaintiff to determine whether he has made a showing sufficient to allow the theory to be raised at this point in the proceedings.  As discussed below, the Court finds he has not done so.

There are three requirements that must be satisfied to pierce a corporate veil:  a showing of instrumentality or domination, improper purpose, and proximate causation of harm to the plaintiff. *See Scott v. AZL, supra*.  The only evidence Plaintiff submitted in support of his alter-ego theory consisted of documents indicating that Defendant Williams and his wife are GTWP's sole shareholders, directors, and officers; that there are no contracts or compensation agreements for GTWP's officers; and that only one meeting of GTWP's board of directors has taken place during the last five years.  [Doc. 155, Exh. F]  For purposes of this motion only, the Court will accept that this evidence is sufficient to establish an issue of fact concerning the first factor, whether GTWP was a mere instrumentality of Williams' or was dominated by him.  *See, e.g., Garcia v. Coffman*, 946

11

P.2d 216, 220 (N.M. App. 1997) (evidence that defendant was sole shareholder; board of directors consisted of family members and employees; and all important decisions were made by defendant and his wife, was sufficient to allow finding of instrumentality or domination).

Plaintiff has presented no evidence or argument, however, that satisfies the second factor – the improper purpose requirement.  The only "improper" purpose Plaintiff has pointed to is the alleged breach of contract committed by GTWP.  This type of run-of-the-mill breach of a commercial contract, however, is not the type of improper purpose contemplated by the veil-piercing doctrine.  As New Mexico courts have put it, this factor requires "some form of moral culpability" on the part of the dominating party.  *Scott v. AZL, supra*, 753 P.2d at 901.  This moral culpability exists, for example, when a corporation is left underfunded, to the detriment of creditors and the benefit of the dominating party.  *See Garcia v. Coffman, supra*, 946 P.2d at 221 (discussing cases).  It has also been found when the corporation is used to help perpetuate a fraud or other illegal act.  *Id.*  Plaintiff's alleged improper purpose in this case is nothing more than an accusation that Defendant Williams caused his corporation to breach a contract, and is using the corporate form to avoid personal liability for the corporation's action.  That is the classic purpose for which a corporation is formed -- to engage in commercial activity while avoiding personal liability for resulting debts.  There is no evidence that Defendant Williams deliberately left GTWP in a position such that it is unable to pay its creditors, or used GTWP to commit fraud or some other illegal act.  The Court will therefore not allow the alter-ego theory to be a basis of a claim against Defendant Williams.  Summary judgment will be granted on the breach-of-contract claim brought against him personally.

**Breach of Contract Claim Against GTWP:**  On October 5, 2007, Plaintiff and GTWP executed a document entitled "CONTRACT/AGREEMENT."  [Complaint, exh. A]  The subject of this agreement was the sale by Plaintiff and purchase by GTWP of bundled firewood at $1.45 per

bundle, F.O.B., as well as bagged pinyon pine at $1.60 per bag F.O.B.  No specific amount of bundled firewood or bagged pinyon[4] was mentioned in the agreement; instead, the total number of loads sold by Plaintiff was to be determined by purchase orders submitted by GTWP.  The agreement was to be in effect for 24 months.  On July 24, 2008, nine and a half months later, GTWP wrote a letter to Plaintiff stating, "Please be advised that we are terminating your contract, effective immediately." [Complaint, Exh. B]  Plaintiff maintains this termination of the contract was a breach of the parties' agreement, and brought this lawsuit as a result.

GTWP initially moved to dismiss the breach-of-contract claim, arguing that the absence of a specific quantity term rendered the sales contract  unenforceable under the Texas U.C.C.   This Court denied the motion, refusing to find as a matter of law that the agreement was not enforceable. [Doc. 116]  The Court pointed out that the agreement is ambiguous, because it can be construed as an exclusive-dealing contract under Texas law.  If that is the case, the absence of a specific quantity term is not fatal; instead, the parties are required to use their best efforts during the term of the agreement, one to find a market for the product and the other to produce a sufficient amount of the product.  The Court ruled that evidence of the parties' intentions would be needed to determine whether the agreement is enforceable or not.  Following discovery, GTWP has now moved for summary judgment on the contract claim, again arguing that the October 2007 agreement is not enforceable.

The course of conduct followed by the parties was as follows: (1) During the wood-gathering season, Plaintiff would assemble a number of pallets of bundled firewood, from various sources; (2) approximately once a week, he communicated the quantity he had available to GTWP; (3) GTWP would then issue a purchase order for that quantity; (4) GTWP would send a truck to pick up the

---

[4]This is the spelling used in the contract and is therefore also used by the Court in this opinion.

pallets of firewood from Plaintiff's location; and (5) Plaintiff would then fax an invoice to GTWP, and GTWP would submit payment for that load to Plaintiff's bank.  [Doc. 165, Exh. A, pp. 436-442] It is GTWP's position that no enforceable contract was formed until Plaintiff informed GTWP of his bundled-firewood inventory and GTWP sent Plaintiff a purchase order for that amount of wood. In other words, GTWP contends the overarching October 2007 agreement is not enforceable, due to the lack of a specific quantity term; once a specific quantity was established, as was the case with each separate transaction for each separate truckload of firewood, then and only then was an enforceable contract created.

        In response to the Court's earlier opinion, GTWP first focuses on the question of whether the parties' agreement should be considered an exclusive-dealing contract.  GTWP makes a number of different arguments in support of its contention that no exclusive-dealing contract was formed by the parties.  First, GTWP points out that nothing in the agreement or in the parties' course of dealing required GTWP to purchase any firewood bundles at all from Plaintiff.   Plaintiff himself acknowledged that if GTWP had no orders for firewood, GTWP was not obligated to buy any firewood from Plaintiff.  [Doc. 165, Exh. A, pp. 567-68]  This argument does not address the nature of an exclusive-dealing contract.  As the Court discussed in the prior opinion, in such a contract the buyer's obligation is to use its best efforts to create a market for the seller's products. In other words, if Plaintiff was contractually obligated to sell his firewood only through GTWP, GTWP was in turn obligated to use its best efforts to obtain orders for firewood from Walmart and other similar customers.  *See* Tex. Bus. & Com. Code Ann. § 2.306(2) ("A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."); *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 234 (Tex. App. 2001).   Therefore, the fact that GTWP was not obligated to buy firewood from

14

Plaintiff if GTWP had no orders of its own does not affect the issue of whether the contract was an exclusive-dealing contract or not.  To answer that question, the Court must examine the language of the contract itself as well as the evidence presented concerning the parties' intentions.

The pertinent language of the contract is as follows:  "...the Seller agrees that during the term of this CONTRACT/AGREEMENT, and for twenty-four months after the termination of this CONTRACT/AGREEMENT, the Seller shall not ... sell the same or similar products in the Continental United States.  It is understood that all sales of BUNDLED FIREWOOD shall go through GOODTIMES WOOD PRODUCTS, INC." [Complaint, Exh. A] GTWP points to the fact that the agreement mentions only the Continental United States, and argues Plaintiff was allowed to sell firewood to Mexico.  GTWP also points out that Plaintiff has had cross-border commercial dealings before, in the import/export arena.  [Doc. 165, Exh. A, p. 877]  There are two problems with this argument.  First, the sentence in the contract that follows the "Continental United States" provision seems to limit sales of bundled firewood exclusively to GTWP.  Although the contract might permit sales of some types of firewood to Mexico, it could be construed as prohibiting Plaintiff from making sales of bundled firewood to any entity except GTWP.  With respect to bundled firewood, therefore, the contract could be considered an exclusive-dealing contract.  In addition, GTWP has cited no case indicating that an exclusive-dealing arrangement must apply to the entire world rather than a specific territory, and the commentary to § 2.306 of the Texas Commercial Code appears to contemplate the contrary.  *See* § 2.306, cmt. 5 (under exclusive dealing contracts the seller "is expected  ... to refrain from supplying any other dealer or agent **within the exclusive territory**.") (emphasis added).  The language of the contract, standing alone, is ambiguous as to the nature of the contract and whether it constitutes an exclusive-dealing agreement.

The evidence concerning the parties' intentions is also conflicting.  First, Defendant Williams himself agreed that the contract prohibits Plaintiff from selling the same or similar products to

anyone other than GTWP, within the continental United States.  [Doc. 167, Exh. 1, pp. 24-25]
Plaintiff testified first that he did not agree the contract allowed him to sell firewood in Mexico, then
that he did not know if that was true, and then (after being shown the contractual language) that the
contract would not have prevented him from doing so.  [Doc. 165, Exh. A, pp. 876-77]  As for the
parties' course of conduct, there is no evidence that Plaintiff sold any firewood to an entity other than
GTWP before GTWP terminated the contract, and there is evidence that GTWP always purchased
whatever amount of bundled firewood Plaintiff had available.  [Doc. 165, Exh. 1, p. 436]  On the
other hand, there is evidence that Plaintiff (operating as VIVI Wood Products) signed a contract with
a company called Lost Coast Forest Products in January 2008, although Lost Coast did not sign the
same  contract until August 2008, after GTWP terminated its agreement with Plaintiff.  [Doc. 165,
Exh. D]  VIVI supposedly, according to Plaintiff, did not deliver any firewood to Lost Coast until
two months after the GTWP contract was terminated.  [Doc. 165, Exh. A, p. 875]  It is not clear
whether Plaintiff was holding the Lost Coast contract in reserve and did not submit it to Lost Coast
until after the GTWP contract ended, or why there was such a long delay between Plaintiff's and
Lost Coast's respective executions of the contract.  It suffices to say that there are many genuine
issues of material fact concerning the parties' intentions with respect to the October 2007 agreement.
Viewing the evidence in the light most favorable to Plaintiff, it is entirely possible the contract was
intended to make GTWP the sole distributor of the bundled firewood produced by Plaintiff, which
is the essence of an exclusive-dealing contract.

GTWP argues that even if the contract could be considered an exclusive-dealing contract,
it is not enforceable because it is too indefinite.  GTWP again argues that it was not required to order
any wood at all, and the response again is the same – if this was an exclusive-dealing contract, the
requirement was not that GTWP order a certain quantity of wood, but that GTWP use its best efforts
to find a market in which to re-sell the wood supplied by Plaintiff.   GTWP also contends that the

16

U.C.C. requires that there be a reasonably certain basis for a remedy, and that without such reasonably certain basis the contract is unenforceable. *See* Tex. Bus. & Com. Code Ann. § 2.204(c) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."). GTWP argues that without specific quantity terms, there can be no reasonably certain basis for a remedy, because Plaintiff could pick any number, state that as the amount of firewood he could have produced during the duration of the contract, and base his damage claim on that arbitrary number. However, this argument is nothing more than a rejection of the "best efforts" gap-filler that is explicitly established by § 2.306(2).

Texas courts and other courts have held that an exclusive-dealing contract is enforceable despite the lack of a specific quantity term, and the basis of any remedy that is warranted is the amount of goods that would have been bought and sold if both parties had been using their best efforts as required by § 2.306(2). *See, e.g., Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, *supra*, 48 S.W.3d at 234, 240 (finding § 2.306 to be a "gap filler" and affirming damage award of $200,000 that was based on "best efforts" standard and supported by evidence); *Griffith v. Clear Lakes Trout Co., Inc.,* 200 P.3d 1162, 1170-71 (Idaho 2009) (quantity covered by contract was established by buyer's requirements and seller's output; proper measure of damages was based on average of two years of production under contract). In this case, there is evidence of how much bundled firewood Plaintiff produced while the contract was in effect, presumably using his best efforts to produce that amount. Evidence should be available concerning Plaintiff's costs of production. It also appears there is evidence that GTWP's demand for Plaintiff's firewood would have remained at least at the same level. If Plaintiff can prove there was an enforceable agreement to continue purchasing his bundled firewood, and can prove GTWP breached that agreement without legal justification, it should not be difficult for a fact-finder to determine the amount of profit

17

Plaintiff lost as a result of the breach.  It is also clear that Plaintiff will not be allowed to simply select an arbitrarily high number as the amount of firewood Plaintiff would have produced had the agreement not been terminated, as this amount will be limited by the best-efforts standard as well as the good-faith requirement established by the Commercial Code.  *See* § 2.306(1) (in measuring quantity under output or requirements contracts, good faith is required and no quantity unreasonably disproportionate to prior output or requirements may be demanded); § 2.306, cmt. 5 (an exclusive dealing agreement implicates the good-faith requirements of output and requirements contracts as set out in § 2.306(1)); *Aquila Pipeline, supra,* 48 S.W.3d at 234.  For that reason, GTWP's argument concerning the lack of a reasonably certain basis for a remedy is not persuasive and summary judgment will not be granted on the strength of this argument.

GTWP next maintains that Plaintiff did not tender any bundled firewood after the contract was terminated, and contends he cannot recover for breach of contract without such a tender.  In support of that argument GTWP cites the *Aquila* case, *supra*, 48 S.W.3d at 235.  It is true that *Aquila* recites the elements of a breach-of-contract claim as including a requirement that the plaintiff performed or tendered performance.  However, *Aquila* proceeds to note that where the UCC applies, as in this case, "common-law rules of law regarding breach of contract do not apply."  *Id.*  One provision of the Texas Commercial Code is especially pertinent here:  according to § 2.610, "[w]hen either party repudiates the contract with respect to a performance not yet due ... the aggrieved party may ... (3) ... suspend his own performance ..."  In other words, once GTWP declared the contract at an end, Plaintiff was not required to continue to assemble bundles of firewood, pay the Cookes for any bundles they prepared, and submit inventories to GTWP, only to have GTWP reject them.  Simply to state what GTWP would have Plaintiff do establishes that it is not a reasonable requirement.  *See, e.g.,* Vol. 1, James J. White and Robert S. Summers, *Uniform Commercial Code*,

p. 442 (Fifth Ed. 2006) (under both common law and § 2-610(c), the repudiatee may at minimum suspend his own performance);  *see also American List Corp. v. U.S. News and World Report, Inc.,* 549 N.E.2d 1161, 1165 (N.Y. 1989) (UCC § 2-610 eliminates need for further tender following repudiation of contract); *Dehahn v. Innes*, 356 A.2d 711, 719 (Maine 1976) ("When the other party has already repudiated the agreement, a tender would be a futile act and is not required by law."). In sum, the lack of a tender of firewood following GTWP's termination of the contract does not preclude Plaintiff from recovering on his breach-of-contract claim.

GTWP's final argument concerning the claim for breach of contract is that Plaintiff failed to perform on a contract to produce pinyon wood for GTWP to resell.  As the parties are aware, the pinyon wood agreement consisted of a purchase order from GTWP to Plaintiff, for approximately 40 loads of packaged pinyon pine, dated in late May 2008.  [Doc. 155, Exh. A]  GTWP contends this purchase order was an enforceable contract, that Plaintiff breached the contract by not producing any pinyon, and that this breach precludes Plaintiff from recovering under the October 2007 agreement.[5] For at least two reasons, this argument is not a persuasive basis for a grant of summary judgment.

First, there is a fact issue as to whether the purchase order for pinyon was intended to be an enforceable contract at all.  Plaintiff contends the purchase order was intended not as an actual contract, but as a document intended to facilitate his ability to obtain financing from his bank, so that he could purchase the pinyon that he could then provide to GTWP.  There is evidence in the record that supports this argument; Defendant Williams informed Plaintiff in writing that he would send a blanket purchase order to Plaintiff, for 40 loads of pinyon, and that Plaintiff could then "carry" the purchase order to his bank.  [Doc. 167, Exh. A-2, p. 161]  Williams also testified that Plaintiff told him the purchase order was not sufficient to allow him to obtain financing, so Williams had GTWP

---

[5]This alleged breach is the subject of GTWP's counterclaim, as well as GTWP's motion for summary judgment on that counterclaim.

issue a letter of credit to Plaintiff, in a further attempt to help with the financing so that he could purchase pinyon. [Doc. 164, Exh. C, p. 162] The Court also notes that the purchase order for pinyon did not follow the usual practice of the parties under the October 2007 agreement; normally a purchase order would not be issued until Plaintiff had assembled a quantity of bundled firewood and submitted an inventory to GTWP. The pinyon purchase order, on the other hand, was issued far in advance of any actual production of pinyon by Plaintiff.

GTWP contends this evidence should not be considered, as it is parol or extrinsic evidence barred by rules of contract construction. However, this evidence is offered not to vary the terms of the alleged contract, but to prove that no true contract was ever intended or entered into by the parties. Under Texas law, "[e]vidence is admissible, at least in equity, to show that a writing which apparently constituted a contract was never intended or understood by either party to be binding as such..." *King v. Fordice*, 776 S.W.2d 608, 610 (Tex. App. 1989). This rule applies to sales of goods as well as to other types of transactions. *Id.* at 612. In a case analogous to this one, evidence was presented purporting to show that a promissory note was delivered to one party only to assist that party in establishing losses for tax purposes, and was not intended to create an actual contract. The court upheld the admissibility of such testimony, stating that "[p]arol evidence is always competent to show the non-existence of a contract." *Bill Shannon, Inc. v. San Clemente*, 724 S.W.2d 941, 943 (Tex. App. 1987). That is the situation here; the evidence cited above is admissible and creates a genuine issue of fact as to whether the pinyon purchase order was intended to be a valid, enforceable contract.

In addition, the Court notes that even if the purchase order is valid and enforceable, there is an issue of fact (or perhaps mixed fact and law) as to whether Plaintiff should be considered in breach of the contract. GTWP terminated the October 2007 agreement, into which the pinyon order had been integrated, before any performance was due under the pinyon purchase order. The purchase

order requests that Plaintiff schedule the first loads of pinyon to be ready for shipment by August 1, 2008. [Doc. 155, Exh. A] A week prior to that date, on July 24, 2008, GTWP executed a letter terminating the agreement, "effective immediately." [Complaint, Exh. B] By doing so, GTWP repudiated the contract prior to the date Plaintiff was first obligated to perform. No party has briefed the effect of this anticipatory repudiation, and the Court will therefore not address that issue. At minimum, however, it raises questions as to whether Plaintiff should be considered in breach of contract for failing to supply any pinyon to GTWP. *See* § 2.610, *supra* (where one party repudiates a contract before the other is obligated to perform, the repudiatee may suspend its own performance). The sequence of events here raises difficult issues about whether GTWP was entitled to repudiate the contract prior to the first due date for pinyon, or whether that repudiation is itself a type of breach of contract. Again, however, no party has briefed these issues and the Court will not rule on them at this point. The Court will, however, hold that summary judgment would not be appropriate even if the pinyon purchase order is considered an enforceable contract.

GTWP raises one other argument that is relevant to the breach-of-contract claim. GTWP contends that even if the October 2007 agreement is an enforceable contract, and even if GTWP breached that contract, summary judgment should be granted because Plaintiff can prove no damages as a result of the breach. GTWP reprises its arguments that it has paid for all the wood Plaintiff has so far delivered, that no damages should be awarded for wood that has not and will never be delivered, and that the absence of a quantity term makes damages inherently speculative. The Court has already addressed these arguments above. If GTWP breached a valid contract without legal justification, it will be liable for damages, which according to the Texas Commercial Code can be measured in two ways: (1) the difference between the market price at the time and place for tender and the unpaid contract price together with any allowable incidental damages, less expenses saved as a result of the buyer's breach; or (2) the profit (including reasonable overhead) which the seller

would have made from full performance by the buyer, together with any incidental damages provided in this chapter, taking into account costs reasonably incurred and the seller's duty to mitigate damages by finding another buyer.  Tex. Bus.  Com. Code, § 2.708; *Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 556 (Tex. App. 1991).  In other words, standard measurements of damages in contract cases will apply, with the "best efforts" standard of § 2.306 determining the quantity factor that is lacking in the contract.  Therefore, damages can and will be awarded if Plaintiff can establish a breach of the October 2007 agreement occurred.

In sum, there are genuine issues of fact as to whether the October 2007 agreement is an enforceable exclusive-dealing agreement, under which GTWP was the exclusive agent for bundled firewood produced by Plaintiff.  There are also genuine issues of fact as to whether Plaintiff was performing satisfactorily under the agreement, or whether GTWP had legal justification for repudiating the contract prior to the expiration of its 24-month term.  For these reasons, summary judgment will not be granted to GTWP on the breach-of-contract claim set out in Count V of the complaint.

**Breach-of-Contract Counterclaim by GTWP:**  As mentioned above, GTWP contends Plaintiff breached the purchase order for 40 loads of pinyon wood, by failing to deliver a single load, and asks for summary judgment on this counterclaim.  This contention is answered by the discussion in the preceding section.  Genuine issues of fact exist as to whether the pinyon purchase order was an enforceable contract, and also as to whether failure to deliver pinyon was a breach of contract when the agreement was repudiated prior to the date Plaintiff's performance was due.  Summary judgment will therefore be denied as to GTWP's counterclaim.

**Prima Facie Tort:**  Plaintiff claims Defendants GTWP and Williams committed a prima facie tort by their actions in this matter.  To prove such a tort, a plaintiff must establish (1) an intentional and lawful act, (2) with the intent to injure the plaintiff, (3) injury to the plaintiff as a

result of an intentional act, and (4) the absence of sufficient justification for the injurious act. *See Schmitz v. Smentowski*, 785 P.2d 726, 734 (N.M. 1990). Significantly, a plaintiff cannot simply base such a claim on the same allegations that support his other claims; the prima facie tort cause of action is useful only when there are factual allegations that are somehow unique, that do not give rise to another tort or contracts claim, but that demand redress. *See Healthsource, Inc. v. X-Ray Assoc.s of New Mexico,* 116 P.3d 861, 872 (N.M. App. 2005). In this case, Plaintiff has identified no other grounds for his prima-facie-tort claim other than the facts supporting his tortious-interference-with-contract claim and his breach-of-contract claim. The Court has already determined that summary judgment should be granted on the tortious-interference claim. As to the breach-of-contract claim, if GTWP was in breach of contract the remedy for that breach lies in contract, not tort. If GTWP was not in breach of contract, its legal position was justified and cannot be the basis of a claim for prima facie tort. Summary judgment will therefore be granted on this claim.

**Conclusion**

Based on the foregoing, summary judgment will be granted to Defendants GTWP and Williams as to all claims raised by Plaintiff except the breach-of-contract claim brought against GTWP. Summary judgment will be denied with respect to GTWP's counterclaim for breach of contract.

**ORDER**

Based on the foregoing Memorandum Opinion, it is ORDERED that the motions for summary judgment (Docs. 146, 164, 165) filed by the Defendants GTWP and Williams be, and hereby are, GRANTED in part and DENIED in part, as discussed in the opinion.

Dated this 22nd day of March, 2011.

**BRUCE D. BLACK**
United States District Judge